Ross *v*. Springstun.

4-9538                                        242 S. W. 2d 116

Opinion delivered July 2, 1951.

Rehearing denied October 8, 1951.

*Tom Pearson* and *James R. Hale,* for appellant.

*Rex W. Perkins* and *Suzanne Chalfant Lighton,* for appellee.

Paul Ward, J.   In 1945 and for many years prior thereto appellee, J. Q. Springstun, and his wife, Faner Springstun, now deceased, lived on a 110 acre farm in Washington County, valued around $12,000.   Both parties were old and Mrs. Springstun in particular was somewhat feeble and they felt the need of someone to look after and care for them, consequently they wrote to their granddaughter, Melba Ross, married to Clyde Ross, who lived in California, and asked her and her husband to come back and take care of them and promised to give the farm to Mrs. Melba Ross if they would do so.   Clyde Ross at the time had a job in California which paid around $100 a week, but he and his wife decided to accept the proposition made by Mr. and Mrs. Springstun and did come to Washington County and moved on the farm in·November of 1945.   Clyde and Melba Ross took charge of the farm and started taking

care of Mr. and Mrs. Springstun. On December 11, 1945, Mr. Springstun, pursuant to his agreement, executed a codicil to his will whereby he willed the farm to Melba Ross. This situation obtained until some time in March, 1947, when some dissatisfaction arose and the Springstuns moved to the home of another granddaughter, Dorothy Webb, who with her husband, Pete Webb, lived in Fayetteville.

On March 21, 1947, J. Q. Springstun executed another will in which he gave his estate, including the farm, to his granddaughter Dorothy Webb in consideration that she and her husband would take care of Mr. Springstun and his wife, Faner Springstun. Dorothy Webb died on March 16, 1949, after which Mr. Springstun and his wife continued to live at the Webb home until the first week in June, 1949, when they moved to the home of McKinley Morton and Grace Morton, who also are appellees. On June 14, 1949, Mr. Springstun executed another will in which he gave McKinley Morton and Grace Morton, his wife, all of his estate after giving one dollar each to four other persons. The Mortons are not related to the Springstuns. September 10, 1949, Mrs. Springstun died at the home of the Mortons and Mr. Springstun has continued to live there ever since. During all of this time Mr. and Mrs. Ross have been living on the Springstun farm.

Mr. Springstun as plaintiff filed a suit on January 10, 1950, in Washington Circuit Court against Clyde and Melba Ross as defendants, seeking to gain possession of the 110 acre farm and also judgment for a reasonable rental. The defendants answered and on their motion the cause was transferred to equity. About three months later appellants, Clyde and Melba Ross, filed suit in the same Chancery Court against these appellees seeking specific performance of their contract with J. Q. Springstun and seeking to enjoin him from executing any will other than the one made to them and to enjoin Springstun from disposing of the said farm. The two cases were consolidated and tried on July 5, 1950, when the Chancellor took the matter under advisement and rendered a decree September 15, 1950. The lower court

refused to grant specific performance in favor of Clyde and Melba Ross, finding that they had breached their part of the agreement, but did render judgment in their favor in the sum of $2,000 against Mr. Springstun, making said judgment a lien against the farm with sixty days in which to pay the same, whereupon, the possession of the farm was to be returned to Mr. Springstun, together with all improvements placed thereon by appellants. From the above findings and judgment of the lower court, both sides have appealed.

Appellants have presented able arguments and briefs on the question of specific performance in situations such as this, but this question becomes moot if the lower court was correct in finding that appellants breached their part of the agreement with the Springstuns and we are of the opinion that the evidence sustains the holding of the lower court.

Clyde Ross was thirty-one years old and prior to 1945 lived in Oakland, California, where he worked as an operating engineer, making around $100 a week. He is the husband of Melba Ross, who is the granddaughter of Springstun. He and his wife came back to Washington County because they knew Mrs. Springstun had had a stroke and was partially paralyzed and unable to do her house work. They came back because Mr. and Mrs. Springstun had requested them to do so and because they said they would turn the place over to them. Pursuant to the agreement the Springstuns stayed on the farm about a year and a half or until March, 1947, and the Rosses provided everything for them on the place, made improvements, etc., to the amount of approximately $1,700. Mrs. Springstun was past seventy years of age, in bad health, was crippled and had to be helped around the house. Mrs. Ross did most of the caring for the Springstuns, provided for the table, and bought the food. Mr. Ross would stay with Mr. Springstun when he would have "spells" with his heart and one time stayed in the house with him three days. He was eighty-two or three years old and when he would have "spells" with his heart he would "black-out." There was a nice tenant house on the farm, and after Mrs. Springstun passed

away Clyde and Melba Ross made arrangements for Springstun to come and live in the tenant house and also made arrangements for Mrs. Utter to come to the farm and take care of him. Mr. Ross says he does not know why Mr. Springstun left the farm as they have been and still are able and willing at all times to perform their contract.

Mrs. Melba Ross, the granddaughter, stated that when they took the Springstuns to Mr. and Mrs. Webb's house, they did not know they were going to stay; that the Springstuns did not take any clothes with them but just decided to remain there; that up until the time when Mrs. Webb died on March 16, 1949, witness visited them, washed and ironed and helped take care of Mrs. Springstun and also washed Mr. Springstun's clothes; she tried to get them to come back to the farm and did everything she knew how to do. At the present time she is taking care of Dorothy Webb's two small children. The first time she knew that the Springstuns were not returning to the farm was the day before they were to move and Mr. Springstun said he was going to the Mortons to stay a couple of weeks; and that he never made any complaint to her or her husband as to why he left the farm, except that Mr. Springstun did say his life depended on the doctors in Fayetteville. After Dorothy died she told Mr. Springstun that her sister, Mrs. Webb, would have been alive today if she had had more help and that she could not get any rest as her grandmother hollered at her day and night. Mr. Webb stated that while the Springstuns were with Mr. and Mrs. Ross he visited them every week or two and did not observe anything out of the ordinary on those visits, and thought that the Springstuns were being given proper attention; that the only thing that Springstun ever said to him was that some time the Rosses would be gone in the day time; that after his wife died he tried to get Mr. Springstun to return to the farm and stay with the Rosses, but he stated he had made a deal with the Mortons and was going to stay with them.

Mrs. Lucy F. Utter, who nurses invalids and old ladies, nursed Mrs. Springstun in the Webb home beginning in February, 1949, and continued to do so until June

1, 1949, testified that during that time Mrs. Ross was a frequent visitor in that home and performed services and helped her grandmother in washing, and cleaning her up; Mrs. Ross asked Mr. Springstun if he would like to return to the farm and he replied that he could not live without being close to Dr. Butt; as far as she knows that is the only reason he gave and he made no complaint about the attention given him and Mrs. Springstun by the Rosses.

According to the testimony of appellee, J. Q. Springstun, there was no agreement or understanding between him and the Rosses; they came to the farm and "stayed with us," but he told them that he would will them the farm if they would take care of him and his wife; he did will the farm to his granddaughter, Mrs. Ross, and turned over possession of the farm to them, with the understanding that they would take care of it and receive all the income. He had a talk with the Rosses about the care they were giving him and his wife and he asked them to stay close to home, but Mrs. Ross stated that they were young and were going to go as long as they were able to be up and around; he was up and around but Mrs. Springstun was feeble and tottering; the Rosses would have company and lots of times they wanted him and his wife to go back in the bedroom and stay there and that he (Springstun) did not like that; Mrs. Ross wouldn't let his wife cook anything when she wanted to help; he would come in the house and find his wife crying; his granddaughter, Mrs. Ross, told him if he did not make "Granny" mind she was going crazy, and it would upset him when he found his wife in this condition; and the situation got so bad that he and his wife decided to leave and go live with Mr. and Mrs. Webb. After the death of Mrs. Webb the Rosses tried to get him and his wife to go back to the farm but wanted to put them in a three-room house, and he and his wife did not want to live in it and he told Ross they were not going, and he never intended to go back to the farm. He says that while his wife was sick Mrs. Ross came to see her only one time and that was three days before she died. He stated that Mrs. Ross seemed to be high tempered and that she told him that

she and her husband were young and were going to run around and if he did not like it he could get out.

Mrs. Grace Morton testified that she and her husband lived on the Springstun farm from 1942 until the fall of 1943; that Mrs. Springstun had had a stroke and otherwise was not well; that before she left the farm Mrs. Ross told her she could not make Granny and Granddad go back in the room and that she felt like they ought to go to bed, and also she had told them her things were not unpacked and she could go back to California.

There was other testimony by neighbors who lived close to the Springstun farm and had visited in the home of Mr. and Mrs. Ross while they were taking care of the Springstuns, tending to refute the statements made on behalf of appellee, Mr. Springstun.

After this cause was tried on July 5th and after the formal decree was rendered on September 17th the court, on September 27, 1950, dictated into the record "A Statement by the Court," from which we set out the following excerpts:

"In this case, when it was tried on July 5, I thought Mrs. Ross ought to have a little time to see if she could reconcile her differences with her grandfather, and work out some way to let them be together; but since that time she has been down to see him one time, and nothing happened. I don't think it's necessary to condemn anybody in this case, too much, but it's the opinion of the Court that the most of the trouble in this case was on the part of Mrs. Ross. In other words, she didn't realize her obligations when she failed to take care of these old people.

. . . . .

"The old folks stayed there 16 months but they have been gone 3½ years; they stayed from November, 1945, until about the 20th of March, 1947. Since that time the Rosses have not been out a thing for the support of these people except, I believe, they did say they paid two weeks, $10.00 a week, nurse hire, or $20.00; and that is all they have been out from March, 1947. Mr. Springstun had some money, $1,200 or $1,400, and he spent all that or gave it to his other granddaughter while with her.

"The Rosses did do some improving out there on the place; the testimony, I think, shows $1,678.50 worth; and they kept those old folks for 16 months. They did leave their business out in California; left a good job out there and came back to take care of them with the expectation of getting the place.

.    .    .    .    .

"I could understand how unreasonable demands could not be met; but from the testimony, I think she failed to measure up to the standards of affection and daily attention required in a case of this kind, so far as Mr. and Mrs. Springstun were concerned. And her attitude on the witness stand showed that she would never give in, she would have it her way, that was her attitude on the witness stand. But when you make a contract to take care of old people you take the obligation of satisfying the old people as long as they don't make unreasonable demands on you.

.    .    .    .    .

"The thing that worried me most is how to do justice in turning the place back to Mr. Springstun. This is what I'm going to do, and when the Rosses leave there, they are not to remove any of the electrical fixtures or the pump that furnishes the water system; I am going to allow them pay for that. They testified how much they put in the Grade A milk barn; that item was $670. The electric pump cost $206, and I expect them to leave that on the place, but I am requiring these other people to pay for it. They show total improvements of approximately $1,698.50, say $1,700, and they have had the use of the place for five years, or it will be that long in October. They kept these old folks for 16 months; of course, a lot of the upkeep was from things that the old people had on hand, and they lived off of that the same as the old folks.

"I think it would be fair for Mr. Springstun to pay Mrs. Ross $2,000, and for Mr. Springstun to have the place exactly as it is now, with all the improvements which I am requiring him to pay for here. I want them left on the place. I will give him 60 days to pay, and at

that time I will declare a lien on the place, if it is not paid, and if he doesn't pay you can have an order of sale; but as soon as Mr. Springstun pays that, he is to have immediate possession.''

It must be conceded that it is a difficult question to decide just who was most at fault in the relationship that existed between Mr. and Mrs. Springstun on the one hand and Mr. and Mrs. Ross on the other, which resulted in the original agreement not being carried out, because of that close personal relationship. On the one hand it is apparent that old people, situated as this couple was— particularly when afflicted—can be troublesome and bothersome, but on the other hand it must be realized by those agreeing to take care of them in their old age that such will likely be the case. In this case the Chancellor had the opportunity of observing all of the witnesses who appeared before him and we are unable to say that his decision was against the weight of the evidence.

It is insisted by appellees that the lower court erred in giving judgment in favor of appellants in the sum of $2,000 against Mr. Springstun. The argument is that if appellants breached the contract then they would not be entitled to any damages. Ordinarily this would be true, but other factors are present in this case. It was because of Springstuns' overtures and promises that appellant Ross left a good job in California and he and his wife came to Washington County to fulfill their agreement and they did take care of and provide for the Springstuns for approximately seventeen months. In the meantime appellants made improvements on the farm. We have not abstracted the testimony in connection with these improvements because they are fairly stated in the ''Statement of the Court'' set forth above. In our opinion the judgment of the court in awarding $2,000 to appellants did justice and equity between the parties and is not against the weight of the evidence.

The decree of the lower court is affirmed both on direct and cross appeal.